O’Connor, C.J.,
dissenting.
{¶ 37} Under R.C. 2925.11, drug possession is penalized according to the amount of the drug involved. The lead opinion’s interpretation introduces a purity or weight requirement for cocaine possession that is not found in the language of the statute or supported by the reality of how cocaine is produced, distributed, or consumed. Thus, I respectfully dissent.
{¶ 38} Powder cocaine is a compound of several ingredients:
[C]ocaine powder is derived by dissolving the coca paste in hydrochloric acid and water. To this mixture a potassium salt (potassium permanganate) is added. The potassium salt causes undesired substances to separate from the mixture. These substances are then discarded. Ammonia is *272 added to the remaining solution, and a solid substance—the powder cocaine—separates from the solution. The powder cocaine is removed and allowed to dry. Prior to distribution, powder cocaine typically is “cut,” or diluted, by adding * * * one or more adulterants: sugars, local anesthetics (e.g., benzocaine), other drugs, or other inert substances. Consequently, the purity level of powder cocaine may vary considerably.
(Footnotes omitted.) United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 12 (Feb. 1995), http://www.usse.gov/research/congressional-reports/1995-report-congress-cocaine- and-federal-sentencing-policy (accessed Oct. 25, 2016). See also Ohio Substance Abuse Monitoring Network, Drug Abuse Trends in the Cleveland Region 81 (Jan.-June 2014), http://www.documentcloud.org/documents/1659531-drug-abuse-trends-in-the-cleveland-region.html#document/pl (accessed Nov. 2, 2016) (cocaine powder in the Cleveland area is cut with lidocaine, procaine, and levamisole, a livestock dewormer); Ohio Substance Abuse Monitoring Network, Drug Abuse Trends in the Columbus Region 102 (Jan.-June 2014), http://mha.ohio.gov/Portals/ 0/assets/Research/OSAMrTRI/Columbus% 20Jan% 202015.pdf (accessed Nov. 2, 2016) (in the Columbus area, cocaine is cut with lidocaine, procaine, levamisole, baby formula, and “anything that is white and powdered”).
{¶ 39} Purity levels of powder cocaine trend downward as the drug is separated into smaller volumes for distribution. For example, in 1995, when purity levels were considered relatively high, a kilogram of cocaine powder averaged 85 percent pure, an ounce averaged 70 percent pure, and a gram averaged 63 percent pure. Abstract, National Criminal Justice Reference Serv., United States Justice Dept., Drug Enforcement Administration, Illegal Drug Price/PuHty Report, United States: Jan.1992-Mar.1995 (1995), https://www.ncjrs.gov/App/ publications/abstract.aspx?ID=158868 (accessed Nov. 16, 2016). Thus, even in kilogram volume, much more than would typically be possessed for individual consumption, powder cocaine is not pure.
{¶ 40} Importantly, the fillers, or adulterants, that reduce the purity level of cocaine along the distribution chain are not intended to be removed before consumption. Quality varies, but this variation does not change the fact that a range of concentrations renders usable cocaine. See Drug Abuse Trends in the Columbus Region at 102 (A participant in the focus group interviews stated, “ ‘[Quality of cocaine] just depends who you get it from * * * [current quality is] garbage’ ”). (Brackets sic and emphasis deleted.) The fillers are inherent in the usable drug. That anything less than what is actually sold and consumed as cocaine would determine the penalty for cocaine possession is illogical and contrary to reality.
*273 {¶ 41} Indeed, the plain language of the statute demonstrates that the General Assembly understood the composition of cocaine and the nature of its distribution, because it defined the offense and the drug in broad terms: “If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine.” (Emphasis added.) R.C. 2925.11(C)(4).
{¶ 42} This description is consistent with the General Assembly’s definition of cocaine to include “[a] salt, compound, derivative, or preparation of [a cocaine salt, isomer, or derivative].” (Emphasis added.) R.C. 2925.01(X)(3). See also R.C. 3719.41 (Schedule 11(A)(4)). The Sixth District concluded that this definition of cocaine does not include the entire mixture. 2015-Ohio-461, 2015 WL 502263, at ¶ 45. But the statutory definition of cocaine plainly encompasses a compound that includes cocaine. And “compound” means “something (as a substance * * *) that is formed by a union of * * * ingredients.” Webster’s Third New International Dictionary 466 (1986). In other words, a compound is a mixture.
{¶ 43} The lead opinion agrees with the appellate court’s analysis, ignoring definitions to achieve an overly narrow reading of the statute. Specifically, the lead opinion concludes that in the penalty portion of the statute, “[i]f the amount of the drug involved equals or exceeds one hundred grams of cocaine,” the term “drug involved” is modified by the words “of cocaine.” Lead opinion at ¶ 17. The opinion further concludes that the term “of cocaine” means “actual cocaine, excluding the weight of any filler materials.” Id. at ¶ 22. And the lead opinion asserts that a “compound” and “mixture” of cocaine are distinct. Id. at ¶ 19.
{¶ 44} But the statutory definition of “cocaine” is a “compound, derivative, or preparation” containing cocaine. R.C. 2925.01(X)(3). It is a stretch of interpretive muscle to conclude that a cocaine mixture—which according to the court opinion is cocaine and filler material—in the form that is to be consumed is not a cocaine “compound, derivative, or preparation.” Indeed, it is just that: cocaine.
{¶ 45} “[Wjords in a statute do not exist in a vacuum.” D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 19. The words must be read in context and construed according to common usage. R.C. 1.42. And we must interpret the statute as a whole, giving effect to all the words in the statute. Commerce & Indus. Ins. Co. v. Toledo, 45 Ohio St.3d 96, 102-103, 543 N.E.2d 1188 (1989).
{¶ 46} Doing so here requires us to give effect to the statutory definitions of “cocaine” and “drug involved,” which include a mixture. Read as a whole, the statute clearly seeks to penalize the amount of compounded cocaine in the offender’s possession, regardless of whether the form of the drug is pure or mixed.
*274 {¶ 47} But under the lead opinion’s interpretation of the statute, it does not matter how much usable drug Gonzales possessed. Instead, because concentration levels vary considerably (but are almost always less than 100 percent), the state must—in every case—reverse engineer the compound or mixture of powder cocaine to separate its parts and determine purity, even when the state has proven the substance to be cocaine under the statutory definition.[2] The lead opinion would create an arbitrary purity distinction for cocaine-possession offenses even though the clear intent of the statute is to establish the appropriate penalty for cocaine possession by the weight of the drug compound involved. The greater the “amount of the drug involved,” not the purity level of the drug involved, the greater the penalty. R.C. 2925.11(C)(4).
{¶ 48} The lead opinion’s conclusion that the General Assembly would treat the weight of cocaine differently from how the drug is treated and sold on the street renders the statute’s penalty-by-weight distinctions irrelevant. For example, imagine two drug offenders who each possess 150 grams of powder cocaine. The first has a 60-percent-pure product and the second a 70-percent-pure product. Under the lead opinion’s arbitrary distinction of separating “cocaine” from filler, they would be penalized differently. The first would possess a net weight of 90 grams of cocaine salt and be subject to a first-degree felony with a prison term chosen among those prescribed for a first-degree felony. See R.C. 2925.11(C)(4)(e). The second offender would possess 105 net grams of cocaine salt and, along with the first-degree-felony conviction, would be labeled a major drug offender and subject to a mandatory maximum prison term. See R.C. 2925.11(C)(4)(f). But both offenders possessed 150 grams of cocaine, and the small purity difference would mean little or nothing to the buyer or user. If the General Assembly had been concerned about purity, rather than total weight, it would have said so.
{¶ 49} We are aware of only two states that require purity testing of cocaine to determine the penalty level of the offense. In both, the relevant statutes expressly require pure weight. For example in Georgia, a cocaine-trafficking offense exists for “any mixture with a purity of 10 percent or more of cocaine.” *275 Ga.Code.Ann. 16-13-31(a). In New York, a possession offense can be based on having 500 milligrams or more of cocaine based on a “pure weight” standard, or by having an aggregate weight of one-eighth ounce or more of cocaine regardless of the purity of the drug. N.Y. Penal Law 220.06.
{¶ 50} Ohio’s cocaine-possession statute resembles neither of these states’ schemes. Thus, we note these examples to demonstrate how rarely a legislature adopts such an approach and the clear intent it expresses when it does.
{¶ 51} Additionally, the lead opinion does not adequately explain why it today interprets the cocaine-possession statute differently from how this court interpreted substantially similar language in an earlier cocaine-trafficking statute, R.C. 2925.03(C)(4)(g), 2000 Am.H.B. No. 528, 148 Ohio Laws, Part III, 5767, 5772, in 2006.[3] Quoting that statute, in State v. Chandler, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, ¶ 18, we held that the penalty provisions for cocaine trafficking required that “the substance involved in the violation is to be cocaine or, at the very least, a ‘compound, mixture, preparation, or substance containing cocaine.’ ” (Emphasis sic.) See also Garr v. Warden, Madison Corr. Inst., 126 Ohio St.3d 334, 2010-Ohio-2449, 933 N.E.2d 1063, ¶ 28 (limiting Chandler to those cases in which the substance offered for sale is recovered and subjected to testing). And, despite the lead opinion’s insistence that Chandler is distinguishable, that case rested on statutory interpretation, not facts. And the court announced in its syllabus the legal principle that to be sentenced as a major drug offender, “[a] substance offered for sale must contain some detectable amount of the relevant controlled substance.” Chandler at syllabus. The lead opinion identifies no basis for announcing a divergent statutory interpretation of the same language in the cocaine-possession statute. And until the appellate court’s decision in this case, Chandler has remained a basis for trafficking and possession convictions that have relied on the total weight of the substance containing the drug. See, e.g., State v. Jackson, 9th Dist. Lorain No. 15CA010828, 2016-Ohio-7637, 2016 WL 6599423, ¶ 17, 19; State v. Reese, 5th Dist. Muskingum No. CT2015-0046, 2016-Ohio-1591, 2016 WL 1570116, ¶ 6. We have accepted a jurisdictional appeal in Reese and have held it for the resolution of this case. 146 Ohio St.3d 1427, 2016-Ohio-4606, 52 N.E.3d 1203.
*276 Paul A. Dobson, Wood County Prosecuting Attorney, and David T. Harold and Gwen K. Howe-Gebers, Assistant Prosecuting Attorneys, for appellant.
Mayle, Ray & Mayle, L.L.C., Andrew R. Mayle, Jeremiah S. Ráy, and Ronald J. Mayle, for appellee.
Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Michael J. Hendershot, Chief Deputy Solicitor, and Hannah C. Wilson, Deputy Solicitor, urging reversal for amicus curiae Ohio Attorney General Michael DeWine.
Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, urging reversal for amici curiae Ohio Prosecuting Attorney’s Association and Cuyahoga County Prosecutor’s Office.
Timothy Young, Ohio Public Defender, and Carrie Wood, Assistant Public Defender, urging affirmance for amicus curiae Office of the Ohio Public Defender.
{¶ 52} Here, there is no dispute that the substance in the baggie was cocaine. The only dispute is how much of the contents of the baggie was filler. As a result of the lead opinion’s interpretation, the offense level for cocaine possession will be determined by an amount that is less than the amount of cocaine in the offender’s possession. This result gives effect to neither the statute as a whole nor the intent of the legislature as expressed in the words of the statute. Because the plain language of the statute requires us to answer the certified question in the negative and hold that the offense level is determined by the total weight of the cocaine plus any filler, I dissent.
O’Donnell and French, JJ., concur in the foregoing opinion.

. Gonzales insists he is not arguing that the state must prove purity of a cocaine mixture. But that is exactly the effect of having to separate “actual cocaine” from fillers. For example, if the cocaine at issue is 10 percent pure, then it is 90 percent filler. In other words, a defendant who possesses 100 grams of usable cocaine powder that is 10 percent pure would be penalized under the statute for possessing only 10 grams, rather than 100 grams. See also People v. McLaurin, 157 Misc.2d 783, 785, 598 N.Y.S.2d 911 (1993) (describing the procedures used by the New York City Police Laboratory to determine the “pure weight” of a cocaine mixture by calculating the aggregate weight, grinding the contents of the powder into a homogenous mixture, extracting small sample quantities across the mixture, testing the samples by gas chromatography to determine purity, and then calculating “pure weight” by multiplying the aggregate weight and the estimated purity).

. At the time, the statute stated, “If the amount of the drug involved ⅜ * * exceeds one hundred grams of crack cocaine ⅜ * *, trafficking in cocaine is a felony of the first degree * * ⅜.” (Emphasis added.) Although the cocaine-trafficking and cocaine-possession statutes no longer make a distinction between crack cocaine and other forms of the drug, the language in both statutes today that requires a certain amount “of cocaine” for a mandatory prison sentence is not materially different. Compare R.C. 2925.11(C)(4)(f) (possessing 100 or more grams of cocaine is a first-degree felony with a mandatory prison sentence) with R.C. 2925.03(C)(4)(g) (trafficking in 100 grams or more of cocaine is a first-degree felony with the same mandatory prison sentence).